The Court having held the matter under advisement till the present term, the Judges delivered their opinions separately, in the following order; the Chief Justice stating the circumstances of the case, and the arguments of the Counsel, in the course of his observations.
M'Kean, Chief Justice:
The negro Betsey, for whom the Habeas Corpus issued (and upon whose fate, that of the two other negroes depends) was born before the 1st of March 1780, to wit, in the year 1779, and her name, age, sex, &c. were not registered in the office of the Clerk of the Peace of the county of Chester, in which the matter, Samuel Moore, then inhabited, on, or before, the 1st of November, 1780, agreeably to the directions of the act of Assembly, entitled, “ An act for the gradual abolition of Slavery,” passed on the 1st of March, 1780. See 2 State Laws 282.
The question, that is submitted to our consideration upon these facts, is, whether the negro can be held as a servant until the attains the age of twenty eight years? or, whether she is absolutely free?
On the part of the master, it has been argued, that, although by the fifth and tenth sections of the act of Assembly, the owner, or master, of any negro, or mulatto, slave, or servant for life, or for thirty one years, then within the State, or his lawful attorney, ought to cause such negro, or mulatto, to be registered on, or before, the 1st day of November 1780; yet, by the fourth section, it is provided, that every negro, or mulatto child, born within this State, after the passing of the act, who, in case the act had not passed, would have been born a servant for thirty one years, for life, or a slave, should be deemed a servant until the age of twenty eight years. It was urged also, that the Legislature could not intend a greater favor to negroes and mulattoes, born as slaves, or servants for life, or until the age of thirty one years, before the passing of that act, than to those born after; that the intention of the Legislature is to govern in the construction of this act, which, as *470 well as in all other legislative acts, in doubtful cases, must be construed according to the reason and sense of the law-makers, expressed in the several parts of the act, or to be collected by considering the frame and design of the whole. 11 Mod. 161. And that the maxim is, Ubi esdem ratio, ibi idem jus.
For the negro Betsey, the counsel have agreed in the rule for the construction of acts of Assembly, but, they argue that the 5th section of the act under consideration is positive, that all negroes and mulattoes, held as slaves, or servants for life, or until the age of thirty one years, should be registered before the 1st of November 1780, or that they should be free; that this was the intention of the Legislature is confirmed by the 10th section, which declares that they shall be deemed freemen and free-women; that where the words are express and positive, there is no room left for construction; that the law favors liberty more than property, and that if the case should appear doubtful, the judgment should be in favor of the liberty of negro Betsey.
Since the argument, the Court have again read the act of Assembly and maturely considered that, and the several reasons urged by the learned Counsel on both sides; and as this is the first case that has come before them upon the arguments of Counsel, and as the judgment now to be given, will govern in all cases of the like fort for the future, it seems to be proper to give the grounds and reasons upon which they found their decision.
It may be observed, that neither in the fifth nor tenth sections, is it said, that negroes or mulattoes held as slaves, or for life, or until thirty one years of age, not registered on or before the 1st of November 1780, shall be free, and discharged from any longer service, but only (by the 5th sect.) that they shall not be deemed to be slaves, or servants for life, or until the age of thirty one years; and by the tenth section it is added, that they shall be deemed as freemen and free-women. The words “ freemen and free-women,” seem to have been used in opposition to the word “ slaves,” or “servants for “ life,” or,“ until the age of thirty one years,” and not to mean, that they shall be absolutely free from every species of servitude. Had this been the intention of the Legislature, words were easily to be found to express it in the most unequivocal manner.
There is a section in this act of Assembly, which was not adverted to by the Counsel on the first hearing, that contributes to clear up the intention of the Legislature on this point: It is the sixth, and comes in by way of proviso or restraint upon the fifth. There, the owners or masters of any such negroes or mulattoes, “ tho’ not registered,” shall be answerable for their maintenance in case they become paupers, unless such owners or masters shall manumit them before they arrive at the age of twenty eight years; by which it is evidently implied, that the former owners or masters may still have an interest in them, notwithstanding they should not be registered; otherwise, why should it be made a condition of an *471 exemption from maintenance, that they should execute and record in the proper county a deed or instrument, securing to such slaves, or servants, their freedom before twenty eight years of age?
The interest remaining to the owner, or master, in an unregistered negro or mulatto, is not expressly declared in any part of the act; but from the scope of the whole it may be collected, that the meaning and intention of the Legislature was, that all negro or mulatto slaves, or servants for life, or until they should arrive to thirty one years of age, within the State at the time of passing the act, who were then under the age of twenty eight years, might be detained as servants until they arrived to that age, though they should not be registered; but if the master detained them in service until that age, and they should afterwards become changeable, in such case, he, his executors, administrators, or assigns, should be obliged to maintain them. This construction seems to be further warranted from that part of the fifth section, which assigns the reason for registering the names, ages, and sexes of slaves, and servants for life, and until thirty one years of age, to wit, in order to ascertain and distinguish them from all other persons; those born before, or after, passing the act, and under twenty eight years of age, as well as those who should not be registered, though above twenty eight years of age.
Though the act of Assembly with respect to this question is not so clear as it might have been, and as I could with it, and though different gentlemen may reasonably entertain different sentiments concerning it, yet as I must give an opinion, it must be my own. Upon the whole then, I think, that negro Betsey should remain as a servant until she shall arrive to the age of twenty eight years, unless freed sooner by her master; and that she be then intitled to the like freedom dues and other privileges, as it she had been born after passing the act for the gradual abolition of slavery.
I know not what other construction to put on the sixth section. If the word “ not” in the fifth line from the end of this section, had been expunged, I should have been of a different opinion; but the engrossed act has been examined, and the word, “ not," is in it. The Legislature must have had some meaning in using this word, as well as in the sentence that provides that, “ unless his or her master or “ owner, shall, before such slave or servant attain his or her twenty “ eighth year, execute and record in the proper county, a deed or “ instrument, securing to such slave or servant his or her freedom.”
By this judgment, if I should be mistaken, the negro Betsey is in no worse situation, than it she had been born after the passing the act, and I do not know a reason why she should be in a better. Were the discharged from her master, she would be incapable to take care of herself, and her parents are unable to educate her: She cannot suffer so much by living with a good master, as being with poor and ignorant parents. By a contrary judgment, she, as I have just hinted, would be little benefited, and her master, who *472 hitherto has derived no advantage from her services, and has been subjected to considerable expences for her food, clothing, and lodging, would be a great sufferer; so that the balance on this consideration seems, likewise, to preponderate on the side for which I have declared my opinion.
Atlee, Justice:—
This cause was argued in the Supreme Court in June 1786; but as Mr. Justice Rush and myself were then absent, another argument was requested for our satisfaction, and the gentlemen of Counsel for the parties having obligingly acquiesced in our wish.
The question arises upon an act of Assembly of this State, intitled, “ An act for the gradual abolition of Slavery,” passed on the 1st day of March in the year 1780; and it is, whether a negro child born before the passing of that act, and not registered agreeably to the directions it contains, shall be free, or be in a similar situation with those born after the passing of the act, that is a servant until twenty eight years of age?
It is agreed that these negro children were born before the passing of the act, and that they and their parents were at that time the slaves, or servants for life, of Samuel Moore of Chester county, who neglected to register them agreeably to the directions of the act. In consequence of this neglect on his part, the parents have obtained their freedom, and the children now seek it, that they may follow, and be under the care and direction of, those parents, instead of a master.
The act, after declaring in the third section, that negroes and mulattoes, born after it was passed, shall not be deemed slaves, or servants for life, and extinguishing all slavery of children in consequence of the slavery of their mother, provides in the fourth section, that such children as should be born after the passing of the law (who would, in case it had not been made, have been born servants for years, or life, or slaves) shall serve until they attain the age of twenty eight years, and, in case of such children being abandoned by the master or mistress, directs their being placed out apprentices by the overseers of the poor.
So far the act confines itself to children born after it was passed, The following section, to wit, the fifth, includes every description of these people of both sexes and all ages, and under this and the tenth section it is, that the parents of these children have obtained their freedom. This directs that every owner of negro and mulatto slaves, or servants for life, or till the age of thirty one years, at that time within the State, shall cause the names, ages, and sexes of such their slave and servants to be registered, or entered on record, in books to be provided for that purpose by the Clerks of the sessions in the several counties of the State, on or before the first day of November 1780; and declares that no negro or mulatto then within the State, shall, from and after the said first day of November, be deemed a slave, or servant for life, or till the age of thirty *473 one years, unless his, or her name, shall be entered as aforesaid on such record. And by the tenth it is enacted and declared, that no man or woman of any nation or colour, except the negroes and mulatoes, who shall be registered as aforesaid, shall be deemed, adjudged, or holden, within the territories of this Commonwealth, as slaves, or servants for life; but as freemen and free-women.
Under these sections of the act, it should seem, that freedom is secured to every negro or mulatto within the State, at the time of making the act, who was not registered agreeably to its directions, on the first day of November 1780: but a doubt hath arisen under the sixth section, with respect to those, who are under the age of twenty eight years, though born before the making of the act.
This section comes in by way of proviso to the fifth, and declares, That any persons who had the ownership or right to the service of any negro, or mulatto, at the time of passing the act, his, or her, heirs, executors, administrators, and assigns, shall be liable to the overseers of the poor of the city or place to which such negro or mulatto shall become chargeable, for the expences such overseer may be put to, through the neglect of the owner, master, or mistress of such negro or mulatto, notwithstanding the name and other descriptions of such negro or mulatto shall not be entered and recorded as aforesaid; unless the master or owner shall, before such slave or servant attain his or her twenty eighth year, execute and record in the proper county, a deed or instrument securing to such slave or servant, his or her freedom.
This clause has given rise to the argument, and it is contended, on behalf of Samuel Moore, that he has a right, upon a just and reasonable construction of it, to the service of these children, until they arrive to their respective ages of twenty eight years, notwithstanding they were born before the passing of the act, and were not registered: But I cannot hold with that opinion.
The fifth section of the act requires entries of all the negro and mulatto slaves, or servants for life, or till the age of thirty one years, within the State at the time of making the act; it directs the mode of those entries; it fixes the time within which the entries shall be made; and, without any exception in respect to their ages, declares that no negro or mulatto then within the State, should be deemed a slave or servant for life, or for thirty one years, unless his or her name should be registered within the time limited. The master or owner had his election whether to enter them, or not; if he did, he secured to himself the right he had in them before the making of the law; and, if he did not, it appears to have been the intention of the Legislature that he should forfeit all right to their services. The tenth section, I think, shows this expressly; for, it not only enacts that such unregistered persons shall not be deemed as slaves, or servants for life, as in the other sections, but adds, that they shall not be holden or adjudged so; and further, that they *474 shall be deemed, adjudged, and holden, as freemen and free-women in opposition, to every species of servitude before taken notice of in the act. As this ambiguous section seems annexed indeed as a proviso to the fifth, it may be taken as intended to deter persons from holding in their service negroes and mulattoes, whom they had not registered according to law.
Had the Legislature intended, that all those who were born before the making of the act and had not attained the age of twenty eight years, should serve till they arrived to that age, they would have shewn that intention in express terms. As persons of that description among the negroes and mulattoes, made a great part of their number, they would have made provision for those of tender age, who might happen to be abandoned by their owners, as they have done with respect to those born after the act and abandoned; they would have made like provision for their redress in case of severe treatment, and, in proportion to their term of servitude before they attained the age of twenty eight years, they would have directed freedom dues, as they have done for the others.
With respect to persons of this colour, those who were servants among us before the passing of the act, were either slaves, or servants for thirty one years: the servitude of twenty eight years is created by this act, and appears to me to be limited to those who are born of registered slaves after it was passed, and to those only.
The preamble to the act, among the unhappy circumstances formerly attending these people, mentions their being cast into the deepest affliction by an unnatural separation and sale of husband and wife, from each other, and from their children: In the present case, it is attempted to separate these children from their parents, by a construction which appears to me to clath with the intention of the makers of the law; while such a construction as will secure freedom to them, and restore them to their parents, will I think, agree best with the design of the Legislature.
I am, therefore, of opinion, that the implied construction contended for in behalf of Samuel Moore, on a doubtful and dark clause in the act, cannot be admitted to opperate in his savour, against the express letter and direction of its fifth and tenth sections; and, consequently, that these persons ought to be discharged from his service.
Rush, Justice
:—The question on the Habeas Corpus, in the case of Samuel Moore's negroes, is a question of construction, arising on the act for the gradual abolition of slavery.
It is admitted, that those negroes were born before the first of March 1780, the date of the law; and that Samuel Moore, who now claims them, was then in possession of them, and that he neglected to register them. It is also admitted, that they were slaves for life, when the act passed.
*475 On the one hand, it is contended, that his neglecting to register then, is attended with an entire loss of their service for life; and, on the other, that it divests the right only from and after the age of twenty eight years.
Whatever be the intention of the Legislature, that must govern. But the difficulty is to find out the intention. An act of Assembly, being the declared will of the Legislature, is to be construed altogether; like this last will and testament of an individual.
When the act for the gradual abolition of slavery passed, there were in Pennsylvania two species of slavery derived from birth; the one being a slavery for life, the other for thirty one years, The latter took place where a child was born of a white mother by a black father. The usage in such case has been, to hold the issue in slavery till the age of thirty one years, in consequence of its base birth. This shews the reason why the Legislature have used the terms “slave, or servant for life, or thirty one years,” in the fifth section of the act: The words are, “ No negro or mulatto within this State, shall, after the first of November, be deemed a slave, or servant for life, or till the age of thirty one years, unless entered upon record;" to prevent and abolish slavery arising from birth, being the great object of the law, as may be seen in the third section of the act now under consideration. It shews further, that those expressions were not adopted by the Legislature, with a design to admit slavery till the age of twenty eight, in the case of children born before the act.
By the particular wording of the tenth section, it would seem, at first view, as if the right to service in the case of a registered slave, who was such by his birth, till the age of thirty one years, was either wholly taken away; or, that registering him, would make him a slave for life. The words are different from the fifth section, and are remarkable. The clause runs, “ No man, or woman, of any nation, or colour, except registered, shall be a slave, or servant for life, but free.” Here the words, “ or till the age of thirty one years,” are omitted. Now, if no man or woman, unless registered, can be a slave for life, it seems to be a natural consequence, that if registered, they will become slaves for life. But this construction is most certainly erroneous; because it proves too much, as it would include slaves for thirty one years. Again; if registering does not make him a servant for life, which it cannot do, so neither does this clause give the master a right, in consequence of registering such negro, to detain him till the age of thirty one years. In the genuine and liberal construction, therefore, of the tenth section, the words, “ or till the age of thirty one years,” should be supplied; and then it will speak the same language with the fifth section, and convey the same idea.
The true intent and meaning, then, of those two sections, considered in one view, I take to be, that all negroes and mulattoes *476 born at the time of passing the act, shall be free from every degree of servitude, unless registered by those who had a right to their service for life, or thirty one years, or by their attornies.
This construction of the law, is corroborated by adverting to the fourth section of the act. By this section, in case any after born child should be abandoned by its master or mistress, from an idea that its service till the age of twenty eight, was not a sufficient compensation for bringing it up, or from any other cause, the overseers are directed to take charge of it:—But why provide for a child born after the act, in case it should be abandoned, and not for a child born before the act in a similar situation? Surely an abandonment was as likely to happen in the one case, as in the other, and from the same cause. The silence of the Legislature on this point, affords a striking argument to prove, that they never entertained an idea that children born before the act, were to be servants till the age of twenty eight; otherwise, the same provision would have been made in both cases. The master, in the case before the Court, had it in his power to have acquired a right to the children for life, if he had chosen to register them; or, by neglecting it, to give them up for ever: And this observation appears to me a satisfactory answer to the argument, that children born before the act, ought not to be placed in a better situation than those born after it. The master might have put them in a much worse situation; and, having run that chance, they ought not now to be placed on the same footing with those born after the act.
But the greatest difficulty in the cause still remains; that is, the sixth section of the act.
By this clause, " Every owner of a negro or mulatto, at the time of passing the act, his heirs, executors, administrators, and assigns, shall be liable to the overseers of the poor, where such negro or mulatto shall become chargeable, for such necessary expences as the overseers may be put to, through the neglect of the owner or master of such negro or mulatto; notwithstanding the name and other descriptions of such negro or mulatto shall not be entered and recorded as aforesaid; unless his master or owner shall, before such slave or servant attain his twenty eighth year, execute and record in the proper county, a deed or instrument securing to such slave or servant his freedom.”
The first observation to be made on this section is, that the neglect of the owner or master therein mentioned, does not mean his neglect to register, but his neglecting to provide for the negro, whereby the overseers are obliged to do it.
I have on several former occasions considered this clause with a good deal of attention. I once suspected there was a mistake in it, and that the word not should be expunged in the paragraph which says, “ notwithstanding the name and other descriptions of such negro or mulatto, shall not be entered and recorded as aforesaid.” *477 Accordingly, I examined at the Roll’s office, the law signed by the Speaker, and also the recorded act, but found them both correspond with the printed law. I still think, however, in construing the act, that word should be rejected. The clause then will mean this,—that, notwithstanding such act of registering, whereby a right is vested in the matter, yet in case the negro should become unable to support himself, and the overseers should do it, the master should be liable to them. In other words, although you comply with the law, and register your Negro, which will make him your property; yet, that circumstance shall not exempt you from the burthen of supporting him afterwards; unless you set him free by deed, recorded in the proper county, before he attains the age of twenty-eight years.
If it should be observed, that this would make the Legislature say a very idle thing, to wit, that a man shall be bound to support his own slave; I answer, the clause goes further: It prohibits him from abandoning his right, unless he does it before his arrival at the age of twenty-eight; and where at the time of registering him he was above that age, he can never afterwards abandon his right, but shall remain always liable to support him. Twenty-eight years was esteemed a proper age, in case of emancipation, under which, it might be reasonably supposed, that aNegro, by a course of industry for a number of years, might add so much to the public stock of wealth, as to be entitled to receive support from the public, if he should be unable to help himself.
By the old law, a person might set free his Negro at any age, on giving security at the County Court, that he should not become chargeable to the public, but that law being repealed by the act now under consideration, it became necessary to restrain the exercise of that right, and to put it on some equitable footing; which this clause has done; by ordering, that the owner of a Negro, although registered, shall always be liable for any necessary expences the public may be put to, through his neglecting to provide for him, unless he shall set him free before the age of twenty eight, in the manner prescribed by the act.
This construction of the sixth section is still further confirmed by attending to the word assigns; every owner of a Negro, his executors, administrators and assigns, shall be liable although the Negro be not entered and recorded. But there can be no assignee of an unregistered Negro, because he is free. The clause, therefore, plainly supposes a transferable property in such Negro to exist, which can only be by registering.
To this construction it may be objected, that there will be no precision in the act, in case of a willful neglect to register old Negroes, with a view to throw them on the public; for, by not registering them, they became free. It would be a sufficient answer to *478 say, that if due provision be not made in every possible contingency, the evil must remain until the legislature think fit to remove it by a new law on the subject. But, we may observe, that, in fact, there could have been few Negroes so old as to be absolutely useless; and still fewer masters so forgetful of past services, and insensible to the feelings of humanity, as to neglect registering their old Negroes, in order to turn them out of doors, and render them a burthen to the public. As nothing of this kind has ever yet been heard of, we may safely pronounce, that the legislature has acted wisely in supposing that any provision in such case, would have been entirely superfluous.
Upon the whole, if we read the act without the word not, the law in all its parts will appear a confident and rational system. In any other view of it, nothing can be more obscure, perplexed, and unintelligible. The word in all probability has slipt into the act by inadvertence; some member mistaking the design of the clause, and moving that as an amendment, which has proved the source of so much intricacy and litigation.
Instances are not wanting where, in construing wills, courts have rejected or supplied words, to comply with the intention of the testator. It is not necessary to cite the authorities to this purpose, as they are familiar to every one.
In the construction of statutes too, Judges have sometimes gone contrary to the general words of it. They have expounded the words of an act contrary to the text, to make it agree with reason and equity. 19 Viner. 514. There can be no exposition against the direct letter of an explanatory statute, which admits there may be against an original statute Where the terms and letter of a statute are obscure and difficult, we must resort to the intent. 19 Viner. 517. 520. Though the statute of 1 Eliz. makes void all leases by Bishops, to all intents and purposes, yet the lease is good against the lessor. To which cases I will only add a determination lately given in this court, in the case of Levinz vs. Will. (Ant. 430.) Although the words of our act of Assembly declare, “ that no mortgage deed shall be good or sufficient to pass any freehold or inheritance, or any estate for life, or years, unless recorded within six months from the date; ” yet this court very properly held such mortgage good against the mortgagor; a decision which is certainly repugnant to the express words and letter of the act.
I concur, therefore, with my brother, Judge Atlee, that the negro children Betsy, Cato, and Isaac, mentioned in the return to the Habeas Corpus as detained by Samuel Moore, should be discharged, it appearing to me, he holds them in custody against the law of the land.
Bryan, Justice:
In this case, I confess, that hitherto I have agreed in opinion with the Chief-Justice; but I now unite with *479 my brothers Atlee and Rush, upon this principle, that it was in the power of Samuel Moore to have secured the service of the Negroes in question; and, having omitted to do so, he cannot, on the one hand, take advantage of his own negligence; nor, on the other, will an ignorance of the law excuse him. The tenth section of the Act of Assembly seems, indeed, inaccurate and insensible; but,as upon a clause of so obscure a kind, I would not wish to press an argument against liberty, I must declare my voice to be in favor of the discharge of the Negroes.
By the Court:—Let the Negroes be discharged.