GRIFFITH, Circuit Judge,
concurring in the judgment:
The majority concludes that the FARR Act does not afford Omar “a right to judicial review of conditions in the receiving country.” Majority Op. 17. I agree that the statute grants Omar, who is being held in Iraq by the U.S. military, no right against being transferred to Iraqi authorities, but I disagree with the majority’s suggestion that we have no jurisdiction to consider his claim. Our quarrel over jurisdiction stems from my belief that the FARR Act “trigger[s] constitutional habeas” by giving Omar a colorable claim that his transfer to Iraqi authorities would be unlawful. Majority Op. 22 n. 7 (emphasis omitted). When an American citizen is in U.S. custody, the Constitution’s guarantee of habeas corpus entitles him to assert any claim that his detention or transfer is unlawful. Because Congress may not deprive Omar of access to the courts without suspending the writ or repealing the statutory basis for his claim, neither of which it has done here, we must consider his argument on the merits.
Section 2242(a) of the FARR Act states that it is U.S. policy not to “expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture.” Pub.L. No. 105-277, § 2242(a), 112 Stat. 2681-1, 2681-822 (1998) (codified at 8 U.S.C. § 1281 note). That gives Omar a colorable claim that it would be unlawful to transfer him to the Iraqi government, which might subject him to torture.[1] The federal habeas statute, 28 U.S.C. § 2241, gives us jurisdiction to hear such a claim from an American citizen, Munaf v. Geren, 553 U.S. 674, 688, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008), and the Supreme Court has repeatedly held that only the clearest of statements from Congress should be read as repealing our habeas jurisdiction, see Demore v. Kim, 538 U.S. 510, 517, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003) (observing that “where a provision precluding review is claimed to bar habeas review,” the Court’s cases require “a particularly clear statement that such is Congress’s intent”); INS v. St. Cyr, 533 U.S. 289, 299, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (“Implications from statutory text or legislative history are not sufficient to repeal habeas jurisdiction; instead, Congress must articulate [a] specific and unambiguous statutory directive[] to effect a repeal”).
Section 2242(d) of the FARR Act, which the majority suggests strips the federal courts of jurisdiction to hear Omar’s claim, does not speak with the required clarity. Although it leaves no doubt that the FARR Act does not itself “provid[e] any court jurisdiction” to hear claims outside the immigration context, it just as plainly leaves undisturbed our jurisdiction to hear FARR Act claims under 28 U.S.C. § 2241. A plurality of the circuits have reached the same conclusion. See Cadet v. Bulger, 377 F.3d 1173, 1182-83 (11th Cir.2004); Ogbudimkpa v. Ashcroft, 342 F.3d 207, 215-18 *26 (3d Cir.2003); Saint Fort v. Ashcroft, 329 F.3d 191, 200-02 (1st Cir.2003); Wang v. Ashcroft, 320 F.3d 130, 142 (2d Cir.2003); Cornejo-Barreto v. Seifert (Cornejo-Barreto I), 218 F.3d 1004, 1016 n. 13 (9th Cir.2000). But see Mironescu v. Costner, 480 F.3d 664, 676 (4th Cir.2007); Cornejo-Barreto v. Seifert (Cornejo-Barreto II), 379 F.3d 1075, 1086 (9th Cir.2004), vacated as moot, 389 F.3d 1307 (9th Cir.2004) (en banc). The different and much clearer language Congress used in the same subsection to strip our jurisdiction to review FARR Act regulations confirms this reading. Congress has told us in unmistakable terms that, “[njotwithstanding any other provision of law,” no court “ha[s] jurisdiction to review the regulations adopted to implement [the FARR Act],” and that “nothing in [the FARR Act] shall be construed as providing any court jurisdiction” to hear a claim like Omar’s. Pub.L. No. 105-277, § 2242(d), 112 Stat. at 2681-822. “Nothing ... but a different intent explains the different treatment.” Lindh v. Murphy, 521 U.S. 320, 329, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).
While section 2242(d) does not purport to deprive us of jurisdiction to consider Omar’s claim against transfer-to-torture, section 106 of the REAL ID Act does. See Pub.L. No. 109-13, § 106, 119 Stat. 231, 310 (2005) (codified at 8 U.S.C. § 1252(a)(4)). In that provision Congress declared that we do not have power to consider FARR Act claims outside of the immigration context, “[n]otwithstanding any other provision of law ... including section 2241 of title 28 ... or any other habeas corpus provision.” Id. This is precisely the sort of “clear, unambiguous, and express statement of congressional intent to preclude judicial consideration” that the Supreme Court’s cases require for Congress to strip statutory habeas jurisdiction. St. Cyr, 533 U.S at 314, 121 S.Ct. 2271; see also Kiyemba v. Obama (Kiyemba II), 561 F.3d 509, 514-15 (D.C.Cir.2009) (holding that the REAL ID Act strips our jurisdiction to consider FARR Act claims, but not passing on whether this would create a Suspension Clause problem if the issue were pressed). And thus Omar’s argument presents a novel issue: whether Congress can strip the courts of habeas jurisdiction to consider a statutory claim that a transfer is unlawful without suspending the writ. As I read the cases and the history, the assumption that undergirds the Suspension Clause is that a prisoner is entitled to raise any claim that his detention or transfer is unlawful, and Congress cannot deny him access to the courts to assert such a claim unless it repeals the basis for the claim or suspends the writ.[2]
The majority has a more limited view of the Suspension Clause. Without offering a theory that explains which claims the clause protects, the majority argues that we cannot consider Omar’s FARR Act claim because it does not fall into any of three categories that apparently make up the majority’s view of the habeas universe. This would be a different case, we are told, if Omar were raising a constitutional claim, Majority Op. 22, a claim that existed in 1789, id. at 23-24 n. 10, or a claim that there is no “positive legal authority” for his transfer, id. at 24. To be sure, constitutional habeas includes these types of claims. But the Supreme Court has told us that constitutional habeas is at least as robust as common law habeas was when *27 Congress passed the Judiciary Act of 1789, St. Cyr, 533 U.S. at 301, 121 S.Ct. 2271, and the majority’s view of our habeas jurisdiction is more restricted than habeas courts’ traditional authority “to examine the legality of the commitment,” Ex parte Watkins, 28 U.S. (3 Pet.) 193, 202, 7 L.Ed. 650 (1830); see also Boumediene v. Bush, 553 U.S. 723, 739, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (“The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom.”).
The majority first argues that we lack jurisdiction to reach the merits of Omar’s claim because he “has no constitutional right at stake here.” Majority Op. 22. But this view of the habeas jurisdiction protected by the Suspension Clause is too cramped. In St. Cyr, the Supreme Court, canvassing the history of habeas, found “no suggestion that habeas relief in cases involving Executive detention was only available for constitutional error,” 533 U.S. at 302-03, 121 S.Ct. 2271, and concluded instead that the Great Writ “has always been available to review the legality of Executive detention,” regardless of whether a prisoner’s claim is based on “the Constitution or laws or treaties of the United States,” id. at 305, 121 S.Ct. 2271 (internal quotation marks omitted).
At common law, the writ of habeas corpus extended to all detention “contra legem terrae,” ie., against the law of the land, 1 Edward Coke, the Second Part of the Institutes of the Laws of England 54 (Williams S. Hein Co. 1986) (1642), and was “efficacious ... in all manner of illegal confinement,” 3 William Blackstone, Commentaries *131. Nothing in the historical record suggests that at the time of the Founding a prisoner could not raise “extra-constitutional” statutory claims when challenging his detention in habeas. Eighteenth-century English habeas courts would order the release of prisoners whose detention violated a statute. See, e.g., King v. Nathan, (1724) 93 Eng. Rep. 914 (K.B.); 2 Strange 880 (considering bankrupt debtor’s statutory argument); Hollingshead’s Case, (1702) 91 Eng. Rep. 307 (K.B.); 1 Salkeld 351 (same); Mellichip’s Case, Morning Chronicle, June 18, 1777 (Mansfield, J.), quoted in 1 James Oldham, the Mansfield Manuscripts and the Growth of English Law in the Eighteenth Century 78 (1992) (allowing seaman to raise statutory and common law claims that he was not subject to impressment). State habeas courts at the time of the Founding also entertained statutory claims. See, e.g., Kennedy & Co. v. Fairman, 2 N.C. (1 Hayw.) 408 (N.C.Super.Ct.L. & Eq.1796) (debtor); Respublica v. Keppele, 2 U.S. 197, 198-99, 2 Dall. 197, 1 L.Ed. 347 (Pa.1793) (indentured servant); Respublica v. Betsey, 1 U.S. 469, 1 Dall. 469, 1 L.Ed. 227 (Pa.1789) (slave); see also Commonwealth v. Downes, 41 Mass. (24 Pick.) 227 (1836) (Shaw, C.J.) (military enlistee); In re Stacy, 10 Johns. 328, 333-34 (N.Y.Sup.Ct.1813) (Kent, C.J.) (ordering release of civilian in military custody accused of treason). If the Suspension Clause “protects the writ as it existed in 1789,” St. Cyr, 533 U.S. at 301, 121 S.Ct. 2271 (internal quotation marks omitted), then it surely allows a prisoner to argue that his transfer violates an act of Congress.
Elsewhere in the opinion, the majority suggests that the Suspension Clause applies only to those statutory claims that were available in 1789. Majority Op. 23-24 n. 10. But St. Cyr itself involved an alien whose habeas petition sought to block his removal on the basis of a claim under the Immigration and Nationality Act of 1952, which roughly paralleled a claim that Congress first created in the Immigration Act of 1917. St. Cyr, 533 U.S. at 294, 121 *28 S.Ct. 2271. Notwithstanding the twentieth-century vintage of the asserted statutory right, the Court found that the claim “could have been answered in 1789 by a common-law judge with power to issue the writ of habeas corpus,” because it challenged “the legality of Executive detention.” Id. at 305, 121 S.Ct. 2271. As the St. Cyr Court understood, a prisoner in executive detention could make any argument that his detention was unlawful, regardless of whether that claim was based on Magna Carta or the most recent innovation of Parliament.
The majority is correct that, prior to the FARR Act, “[h]abeas corpus [was] held not to be a valid means of inquiry into the treatment the [prisoner] is anticipated to receive in the requesting state.” Munaf, 553 U.S. at 685, 128 S.Ct. 2207 (quoting M. Cherif Bassiouni, International Extradition: United States Law and Practice 921 (5th ed. 2007)). But the majority wrongly suggests that Munaf v. Geren limits a prisoner to claims that have “traditionally been part of the habeas or due process inquiry.” Majority Op. 24 (citing Munaf, 553 U.S. at 700-03, 128 S.Ct. 2207). Munaf examined the historical pedigree of the right against transfer to torture only because the petitioners in that case argued that their transfers would violate due process, a claim that triggers inquiry into the historic roots of the asserted right. The Court did not have occasion to consider whether the Suspension Clause entitles prisoners to raise claims based on recently enacted statutes. See Munaf, 553 U.S. at 703 & n. 6, 128 S.Ct. 2207 (reserving question of whether Omar could successfully challenge his transfer under the FARR Act).
Finally, the majority suggests that the Suspension Clause entitles a prisoner to claim that there is no “positive legal authority for [his] ... transfer” but not that his transfer would violate his statutory rights. Majority Op. 24. The majority never explains why the Suspension Clause’s protections depend on a distinction between whether Congress has withheld statutory authority from the Executive to transfer a prisoner or granted a statutory right against transfer, and the difference seems to me no more than “empty semantics.” Id. at 22. For example, Omar’s claim can also be styled as an argument that the government lacks “positive legal authority” to transfer him: he says the FARR Act places his transfer into Iraqi custody beyond the Executive’s power. In fact, Omar articulated his FARR Act claim in exactly this way before the district court, asserting that if his claim succeeds the government “will no longer have any legal ground” to transfer him. Pet’r’s Opp’n to Mot. to Dismiss 18, No. l:05-cv-02374 (D.D.C. Dec. 12, 2008).
But even if there were a meaningful distinction between withholding statutory authority to transfer and granting a statutory right against transfer, the Supreme Court did not recognize any such distinction in St. Cyr. Instead, the Court said that “a serious Suspension Clause issue would be presented” if Congress were to strip all courts of jurisdiction to consider an alien’s claim that he had a statutory right not to be removed. 533 U.S. at 305, 121 S.Ct. 2271. Whatever the merit of the majority’s approach to the Suspension Clause, it is not the approach the Supreme Court took in St. Cyr.
The majority attempts to distinguish and limit the force of St. Cyr by observing that the Court there “addressed removal of aliens under the immigration laws.” Majority Op. 23 n. 10. But St. Cyr did not distinguish between removal of aliens and other forms of executive detention. Rather, the Court found support for its approach in a wide range of precedents be *29 yond the immigration context, including military detention. See St. Cyr, 533 U.S. at 301-02, 121 S.Ct. 2271 (citing habeas cases brought by prisoners of war, impressed seamen, slaves, apprentices, asylum inmates, bankrupt debtors, and criminal defendants, among others). The St. Cyr Court reasoned that the Suspension Clause entitles prisoners to raise any statutory claim that a proposed transfer to another country would be unlawful, see id. at 305, 121 S.Ct. 2271, and the majority offers no support for its contention that this constitutional principle applies only in immigration cases.
I agree with the majority that the Suspension Clause is not a “one-way ratchet.” Majority Op. 22. Congress can always repeal statutory rights or create new authority for detention, thereby limiting the range of habeas claims that federal prisoners may bring. But that is not what Congress has done here. It has not repealed section 2242(a), the ground for Omar’s claim, but has instead sought to limit his ability to bring his claim in federal court. The majority counters that there is no real difference between expressly repealing a right and accomplishing the same end by stripping habeas jurisdiction. Majority Op. 31 n. 8. I disagree. A core premise of the Suspension Clause is that the form of legislative action can make a great deal of difference in terms of political accountability: repealing a right tends to focus the public’s attention in a way that the lawyerly maneuver of jurisdiction stripping does not. See, e.g., 1 William Blackstone, Commentaries *136 (explaining that a direct assault on rights “must at once convey the alarm of tyranny throughout the whole kingdom,” whereas denying a prisoner access to the courts “is a less public, a less striking, and therefore a more dangerous engine of arbitrary government”). In fact, the Suspension Clause was inspired by Parliament’s use of jurisdiction stripping to prevent American prisoners from asserting their statutory and common law rights, see Paul D. Halliday, Habeas Corpus: From England to Empire 251-53 (2010), and Alexander Hamilton thought that the Suspension Clause’s limits on jurisdiction stripping so enhanced the democratic check on wrongful detentions that it rendered a bill of rights unnecessary, see The Federalist No. 84. The Constitution vests in Congress the power to deprive prisoners of judicially enforceable rights, but “requires that it be made to say so unmistakably” by either suspending the writ or repealing the right “so that the people will understand and the political check can operate.” Henry M. Hart, Jr., The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv. L.Rev. 1362, 1399 (1953).
Because Congress has neither suspended the writ nor repealed the statutory basis for Omar’s cause of action, we must consider the merits of his claim. I would follow the Supreme Court’s suggestion in Munaf v. Geren that the FARR Act does not “address[ ] the transfer of an individual located in Iraq to the Government of Iraq.” 553 U.S. at 703 n. 6, 128 S.Ct. 2207. Omar cannot be “return[ed]” to Iraq for a simple reason: “he is already there.” Id. The U.S. military arrested him in Iraq, and he was subsequently convicted in an Iraqi court for violating Iraqi law. He now seeks to use the FARR Act to prevent Iraqi authorities from bringing him to justice, which would effectively “defeat the criminal jurisdiction of a foreign sovereign.” Id. at 696, 128 S.Ct. 2207. Because there is nothing in the FARR Act to suggest that Congress could have intended such a result, I concur in the majority’s judgment.

. I agree with the majority that Congress can "express a policy for the Executive Branch to follow without also creating a right to judicial enforcement of that policy.” Majority Op. 22. But Omar’s claim is that Congress did more than that in the FARR Act — that it gave him a judicially enforceable right against transfer to torture. Even though Omar’s reading of the FARR Act is wrong on the merits, the Constitution’s habeas corpus guarantee gives us jurisdiction to consider his claim.

. Of course, we have no jurisdiction to consider a habeas petitioner’s "wholly insubstantial and frivolous" claim, Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (quoting Bell v. Hood, 327 U.S. 678, 685, 66 S.Ct. 773, 90 L.Ed. 939 (1946)), but the majority does not suggest that Omar's FARR Act claim falls in that category.